**MCKAY LAW, LLC**
Michael McKay (023354)
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

*Counsel for Plaintiff*

[Additional Counsel on signature page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Fraser MacDonald, derivatively on behalf of Sprouts Farmers Market, Inc., | Case No.: |
| Plaintiff, | **Verified Shareholder Derivative Complaint** |
| vs. | |
| Jack L. Sinclair, Curtis Valentine, Joel D. Anderson, Hari K. Avula, Kristen E. Blum, Joseph Fortunato, Terri Funk Graham, Joseph D. O'Leary, and Doug G. Rauch, | **Jury Trial Demanded** |
| Defendants, | |
| and | |
| Sprouts Farmers Market, Inc., | |
| Nominal Defendant. | |

Plaintiff Fraser MacDonald ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Sprouts Farmers Market, Inc. ("Sprouts" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Jack L. Sinclair ("Sinclair"), Curtis Valentine ("Valentine"), Joel D. Anderson ("Anderson"), Hari K. Avula ("Avula"), Kristen E. Blum ("Blum"), Joseph Fortunato ("Fortunato"), Terri Funk Graham ("Graham"), Joseph D. O'Leary ("O'Leary"), and Doug G. Rauch ("Rauch") (together, the "Individual Defendants," and collectively with Sprouts, "Defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Sinclair and Valentine for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE OF THE ACTION</u>**

1. This is a shareholder derivative action that seeks to remedy wrongdoing

2

committed by the Company's current and former directors and officers from June 4, 2025 through October 29, 2025, both dates inclusive (the "Relevant Period").

2. Sprouts is a specialty grocery chain that focuses on health and wellness. Sprouts' products include fresh, natural, and organic groceries, in addition to plant-based, gluten-free, and other diet-specific options. The Company operates over 450 stores in 24 states.

3. Throughout the Relevant Period, the Individual Defendants caused the Company to make a series of false and misleading statements pertaining to the Company's ability to withstand macroeconomic pressures. For example, in an earnings call on July 30, 2025, Defendant Sinclair highlighted that the Company was "seeing strong customer acquisition and an increase in share of wallet and that the Individual Defendants "remain confident in our strategic direction and Sprouts unique position within the specialty food retail landscape."

4. The truth emerged on October 29, 2025, when the Company issued a press release (the "Q3 2025 Earnings Release") announcing its financial results for the third quarter of the 2025 Fiscal Year.[1] The Q3 2025 Earnings Release reported comparable store sales growth below both the Company's previous guidance as well as market expectations. As a result, the Q3 2025 Earnings Release also reported a reduction in the Company's guidance.

---

[1] The Company's fiscal year does not follow the calendar year, but instead is a 52- or 53-week period that ends on the Sunday closes to December 31 each year. For the period of December 30, 2024 until December 28, 2025, the "2025 Fiscal Year."

5.      On this news, the Company's share price dropped $27.30, approximately 26.1%, from a closing price of $104.55 per share on October 29, 2025 to close at a price of $77.25 per share on October 30, 2025.

6.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was not as resilient to macroeconomic pressures as represented; (2) the Company was vulnerable to customers reducing spending in order to be more cautious; (3) as a result, the Company's comparables it used to project its fiscal guidance were inaccurate; and (4) the Company overestimated its fiscal guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

7.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, three of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $8.6 million.

8.      Additionally, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

9.      In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Sprouts to repurchase its own stock at prices

that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2025 and September 2025, approximately 421,290 shares of Sprouts common stock were repurchased, costing the Company *over $59 million*. As the Company's stock was actually worth only $77.25 per share, the price at which it was trading when markets closed on October 30, 2025, the Company overpaid for repurchases of its own stock *by approximately $26.5 million* in total.

10.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a consolidated federal securities class action lawsuit currently pending in the United States District Court for the District of Arizona (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand

5

to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u4(f)).

13.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Sprouts is headquartered in this District.

## PARTIES

**Plaintiff**

16.    Plaintiff is a current shareholder of Sprouts common stock. Plaintiff has continuously held Sprouts common stock at all relevant times

**Nominal Defendant Sprouts**

17.    Nominal Defendant Sprouts is a Delaware corporation with principal executive offices located at 5455 East High Street, Suite 111, Phoenix, Arizona 85054. The Company's shares trade on the Nasdaq Global Market ("Nasdaq") under the ticker symbol "SFM."

**Defendant Sinclair**

18.    Defendant Sinclair has served as CEO and a Company director since June 2019.

19.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sinclair made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| June 12, 2025 | 2,915 | $157.06 | $457,824 |
| June 13, 2025 | 2,915 | $157.72 | $459,765 |
| June 16, 2025 | 4,054 | $160 | $650,444 |
| June 17, 2025 | 4,045 | $161.81 | $654,517 |
| July 7, 2025 | 4,045 | $162.94 | $659,072 |
| July 8, 2025 | 4,045 | $160.63 | $649,764 |
| August 4, 2025 | 4,045 | $156.76 | $634,090 |
| August 5, 2025 | 4,045 | $151.38 | $612,311 |
| September 2, 2025 | 4,045 | $138.60 | $560,620 |
| September 3, 2025 | 4,045 | $137.26 | $555,208 |
| October 6, 2025 | 4,045 | $103.00 | $416,630 |
| October 7, 2025 | 4,045 | $101.47 | $410,434 |

Thus, in total, before the fraud was exposed, he sold 46,289 shares of Company stock on inside information, for which he received approximately $6.7 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

20. The Schedule 14A the Company filed with the SEC on April 8, 2025 (the "2025 Proxy Statement") stated the following about Defendant Sinclair:

Mr. Sinclair has served as our Chief Executive Officer since June 2019. Mr. Sinclair has served as a board member of FMI – The Food Industry Association since 2020. Mr. Sinclair was appointed to the Federal Reserve Bank of San Francisco's Head Office board of directors in January 2025, having previously served on the Los Angeles branch board of directors since January 2021. Previously, Mr. Sinclair served as Chief Executive Officer of 99 Cents Only Stores LLC, a premier discount retailer, from February 2018 to June 2019, and prior to that was its Chief Merchandising Officer from July 2015 to February 2018. From December 2007 to April 2015, Mr. Sinclair was the Executive Vice President of the U.S. Grocery Division of Walmart, Inc. (NYSE: WMT), where he led all aspects of Walmart's U.S. grocery business for its more than 4,000 stores. Prior to joining Walmart, Mr. Sinclair spent 14 years at Safeway PLC in London from 1990 to 2004, where he held several senior management positions that included responsibility for operations, merchandising and marketing for over 450 Safeway supermarket and convenience store locations throughout the United Kingdom. Mr. Sinclair served on the board of directors of The Hain Celestial Group (Nasdaq: HAIN), a leading marketer, manufacturer and seller of organic and natural products, from September 2017 to June 2019.

**Defendant Valentine**

21. Defendant Valentine has served as the Company's CFO since January 2024. He previously served various roles at the Company starting in May 2015, most recently serving as the Company's Senior Vice President of Finance from March 2023 until his promotion to CFO.

22.     The 2025 Proxy Statement stated the following about Defendant Valentine:

*Curtis Valentine* was appointed as our Chief Financial Officer effective January 1, 2024. Mr. Valentine served as the Company's Senior Vice President of Finance from March 2023 to December 2023, having previously served as the Company's Vice President of Financial Planning and Analysis from December 2016 to March 2023 and Senior Director of Financial Planning and Analysis from May 2015 to December 2016. Prior to joining the Company, Mr. Valentine served in financial management roles across multiple business units at PetSmart, Inc. from April 2008 to April 2015. Mr. Valentine holds a B.S. degree from Bowling Green State University and an M.B.A. degree from the W.P. Carey School of Business at Arizona State University.

**Defendant Anderson**

23.     Defendant Anderson has served as a Company director since 2019. He also serves as the Chair of the Talent and Compensation Committee and as a member of the Audit Committee.

24.     The 2025 Proxy Statement the following about Defendant Anderson:

Mr. Anderson has served as Chief Executive Officer and a Director of Petco Health and Wellness Company, Inc. (Nasdaq: WOOF), a leading brand in the U.S. pet care industry, since July 2024. Prior to joining Petco, Mr. Anderson served as President, Chief Executive Officer and a Director of Five Below, Inc. (Nasdaq: FIVE), a leading high-growth value retailer offering trend-right, high-quality products, from February 2015 to July 2024, having previously served as President and Chief Operating Officer of Five Below from July 2014 to January 2015. Prior to joining Five Below, Mr. Anderson served as President and Chief Executive Officer of Walmart.com from 2011 until 2014 and as the Divisional Senior Vice President of the Northern Plains division of Walmart, Inc. (NYSE: WMT) from 2007 to 2011. Prior to joining Walmart, Mr. Anderson was President of the retail and direct business units for Lenox Group, Inc. and served in various executive positions at Toys "R" Us, Inc. over a 14-year period.

**Defendant Avula**

25.     Defendant Avula has served as a Company director since 2022. He also

serves as the Chair of the Audit Committee and as a member of the Risk Committee.

26. The 2025 Proxy Statement stated the following about Defendant Avula:

Mr. Avula served as Chief Financial and Strategic Officer of Clif Bar & Company from May 2021 through February 2023, where he led the financial management and enterprise strategy functions for the nutritious and organic food company prior to its acquisition by Mondelēz International, Inc. Mr. Avula joined Clif Bar from Walgreens Boots Alliance Inc., (Nasdaq: WBA) where he served as Chief Financial Officer of global business transformation and digital/IT from 2020 to 2021 and Chief Financial Officer of retail pharmacy USA from 2017 to 2020. While at Walgreens, Mr. Avula represented the company on the boards of two private entities, AllianceRx Walgreens Prime from April 2018 to December 2019 and BrightSprings Health Services from March 2018 to December 2020. Prior to joining Walgreens, Mr. Avula spent over 22 years at PepsiCo, Inc. (Nasdaq: PEP) in a variety of financial and strategic roles, culminating as Chief Financial Officer for Frito Lay North America from 2015 to 2017. Mr. Avula has also served on the board of directors of Believer Meats since August 2023 and Guayakí Yerba Mate since September 2024.

**Defendant Blum**

27. Defendant Blum has served as a Company director since 2016. She also serves as the Chair of the Risk Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

28. The 2025 Proxy Statement stated the following about Defendant Blum:

Ms. Blum served as SVP and Chief Information Officer of PepsiCo – Latin America from January 2018 to April 2019. In January 2019, Ms. Blum was appointed as Chairperson of The Sprouts Healthy Communities Foundation, our non-profit foundation focused on health and wellness related causes. Ms. Blum also has served as a Director of GuideWell Mutual Holding Corp., a not-for-profit mutual holding company focused on transforming health care, since May 2018, a Director of Sheetz, a family-owned, customer-focused convenience store, since November 2024 and an Advisory Board member of Verneek, an AI software development startup, since June 2022. Ms. Blum previously served PepsiCo (Nasdaq: PEP) as SVP and Chief Information Officer of Global IT Transformation from November 2017 to April 2018, SVP and Chief Information Officer of Frito-Lay from September 2015 to

December 2017 and SVP and Chief Information Officer of Commercial Solutions, Innovation, Data and Analytics from July 2013 to September 2015, as well as SVP and Chief Information Officer of Enterprise Solutions from December 2010 to January 2012. Ms. Blum served as EVP and Chief Technology Officer of J.C. Penney Co. Inc. from January 2012 to June 2013 and SVP and Chief Information Officer of Abercrombie & Fitch (NYSE: ANF) from March 2006 to October 2010.

**Defendant Fortunato**

29.     Defendant Fortunato has served as a Company director since 2013 and as Board Chairman since 2017.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fortunato made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 12, 2025 | 10,000 | $147.57 | $1,475,730.00 |

Thus, in total, before the fraud was exposed, he sold 10,000 shares of Company stock on inside information, for which he received approximately $1.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.     The 2025 Proxy Statement stated the following about Defendant Fortunato:

Mr. Fortunato has served as an Operating Partner at Prospect Hill Growth Partners, L.P., an operationally focused private equity firm, since January 2017. Mr. Fortunato serves on the board of directors of a number of Prospect Hill Growth Partners private portfolio companies, including Comoto Holdings, Inc. (as Chairman since January 2016), Honors Holdings, LLC (since January 2018 and Chairman since January 2024), and Shoe Sensation (since August 2015). Mr. Fortunato previously served as Chairman of the

11

Board, Chief Executive Officer and President of General Nutrition Companies, Inc. (NYSE: GNC; predecessor to GNC Holdings, Inc.), a global specialty retailer of health and wellness products, from November 2005 to August 2014 and was a consultant from September 2014 through December 2016. From 1990 to November 2005, Mr. Fortunato served in various executive roles with GNC, including Senior EVP and Chief Operating Officer, EVP of Retail Operations and Store Development and SVP of Financial Operations. Mr. Fortunato served on the board of directors of Mattress Firm Holding Corp., a retailer of mattresses and bedding-related products, from October 2012 until September 2016.

**Defendant Graham**

32.    Defendant Grant has served as Company director since 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Talent and Compensation Committee and the Risk Committee.

33.    The 2025 Proxy Statement stated the following about Defendant Graham:

Ms. Graham is a Branding Strategy Consultant, having most recently served as interim Chief Marketing Officer of Origin Entertainment, Inc., a film and television production company, from March 2016 to September 2017. Ms. Graham has served on the board of directors of LL Flooring Holdings, Inc. (NYSE: LL), a specialty retailer of hardwood flooring, from October 2018 to December 2024, CV Sciences, Inc. (OTCQB: CVSI), a consumer products and specialty pharmaceutical company, from August 2019 to May 2022, 1-800 Contacts, an online retailer of contact lenses, from July 2015 to January 2016 and Hot Topic, Inc., a formerly publicly traded mall and web-based specialty retailer from June 2012 to June 2013. Ms. Graham previously served as Chief Marketing Officer – Red Envelope for Provide Commerce, Inc., an e-commerce gifting company from July 2013 to September 2014. From September 2007 to December 2012, Ms. Graham served as SVP and Chief Marketing Officer at Jack in the Box Inc. (Nasdaq: JACK), the operator and franchiser of Jack in the Box restaurants, having served in various marketing leadership roles subsequent to joining Jack in the Box Inc. in 1990. Ms. Graham has also served on the San Diego State University Fowler College of Business Advisory Board since September 2023.

**Defendant O'Leary**

34.    Defendant O'Leary has served as a Company director since 2017. He also

serves as a member of the Talent and Compensation Committee and the Nominating and Corporate Governance Committee.

35.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant O'Leary made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 5, 2025 | 2,937 | $150.07 | $440,755 |

Thus, in total, before the fraud was exposed, he sold 2,937 shares of Company stock on inside information, for which he received approximately $440,755 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The 2025 Proxy Statement stated the following about Defendant O'Leary:

Mr. O'Leary served as President and COO of PetSmart, Inc., a formerly publicly traded specialty pet retailer, from June 2013 to April 2014, having previously served as EVP of Merchandising, Marketing, Supply Chain and Strategic Planning from January 2011 to June 2013, SVP of Merchandising from March 2010 to January 2011, SVP of Merchandising and Supply Chain from October 2008 to March 2010, and SVP of Supply Chain from September 2006 to October 2008. Mr. O'Leary has served as a Director of Targeted PetCare, a manufacturer of specialty pet products, since December 2019. Mr. O'Leary previously served as a Director of Edgewell Personal Care Co. (NYSE: EPC), a leading consumer products company, from October 2018 to February 2025, Francesca's Holdings Corp. (Nasdaq: FRAN), a nationwide specialty boutique retailer, from April 2013 to February 2021, PetSmart, Inc., from May 2015 to November 2019, and Big Heart Pet Brands from August 2014 to March 2015. Before joining PetSmart, Mr. O'Leary served as COO of Human Touch, LLC, and various logistics leadership roles with Gap Inc. (NYSE: GPS) from 1999 to 2005, culminating as SVP, Supply Chain Strategy and Global Logistics. Prior to 1999, Mr.

O'Leary held positions at Mothercare plc, Coopers & Lybrand LLP, and BP International.

**Defendant Rauch**

37.    Defendant Rauch has served as a Company director since 2020. He also serves as a member of the Audit Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Ruach:

Mr. Rauch served as a division and later company president of Trader Joe's Company, a chain of neighborhood grocery stores, from 1995 until his retirement from the company in 2008 following a 30-year career. In June 2012, Mr. Rauch founded and has since served as President of Daily Table, an innovative retail concept designed to bring affordable nutrition to the food insecure in Boston's inner city. In January 2010, Mr. Rauch was also a founding board member and Chief Executive Officer of Conscious Capitalism Inc., an organization dedicated to the practice of business as a force for good, where he served as a board member through December 2021 and continues to serve as a board emeritus member. Mr. Rauch has served on the board of directors of PAR Technology Corporation (NYSE: PAR), a leading provider of point-of-sale technology solutions to restaurants and retail outlets, since November 2017, and previously served on the board of Imperfect Foods, a grocery delivery service with a mission to eliminate food waste, from March 2019 to September 2022. Mr. Rauch also served a ten-year term as a Trustee at the Olin College of Engineering from October 2009 to October 2019.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers, directors, and/or fiduciaries of Sprouts and because of their ability to control the business and corporate affairs of Sprouts, the Individual Defendants owed Sprouts and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sprouts in a fair, just, honest, and equitable

14

manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sprouts and its shareholders so as to benefit all shareholders equally.

40. Each director and officer of the Company owes to Sprouts and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sprouts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42. To discharge their duties, the officers and directors of Sprouts were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sprouts, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been

ratified by the remaining Individual Defendants who collectively comprised a majority of Sprouts' Board at all relevant times.

44.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

45.     To discharge their duties, the officers and directors of Sprouts were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sprouts were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Sprouts' own Code of Conduct and Ethics (the "Code of Ethics"), Code of Ethics for Directors (the "Director Code of Ethics"), and Code of

Ethics for the Chief Executive Officer and Senior Financial Officers (the "Officer Code of Ethics") (collectively, the "Codes of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Sprouts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Sprouts and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sprouts' operations would comply with all applicable laws and Sprouts' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

17

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

46.     Each of the Individual Defendants further owed to Sprouts and the shareholders the duty of loyalty requiring that each favor Sprouts' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Sprouts and were at all times acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, directorial, and controlling positions with Sprouts, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sprouts.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

52. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Sprouts was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sprouts and was at all times acting within the course and scope of such agency.

## SPROUTS' CODES OF ETHICS

### *Code of Ethics*

55.    The Company's Code of Ethics is intended to highlight the Company's "commitment to high standards in everything we do, everywhere we do business." The Code of Ethics reflects that the Company "expect[s] our team members, regardless of level or role, to adhere to the highest standards of ethical business conduct."

56.    In a section titled "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> We pride ourselves on providing our guests with value for their dollars. To deliver on expectations of quality products at the best possible prices, each of us has an obligation to make objective decisions based on what is best for Sprouts without regard for personal gain. That means we must avoid conflicts of interest, which are financial, business or other relationships that might be opposed to the interests of the company or might cause a conflict with the performance of your duties. Therefore, you should avoid any actions that

20

create (or appear to create) conflicts of interest with Sprouts. It is impossible to list all of the situations that could present a  conflict of interest, but the following sections outline some of the more common possibilities. It is important that you are familiar  with these situations, recognize a potential conflict when you see  one and take the appropriate action. Questions about potential conflicts of interest and disclosure of these situations as they arise should be directed to your supervisor, Human Resources representative or the Ethics Helpline.

57. In another section titled "Restrictive Trade Practices," the Code of Ethics states the following, in relevant part:

Team members are required to comply with antitrust and competition laws. Federal and state antitrust laws govern the relationships between competitors and are generally designed  to maintain and promote competition in the marketplace. In  general, you must avoid agreements, understandings or plans  with competitors that limit or restrict competition, including   price fixing and allocation of markets. Antitrust laws are complex, so please seek help from the Legal department or  contact the Ethics Helpline if you have any questions.

58. In another section titled, "Fair Dealing," the Code of Ethics states, in relevant part:

You should always deal fairly and ethically with our suppliers, vendors, competitors and other team members. You should be  fair and ethical in purchasing decisions, while putting the company's interests first and seeking to obtain the maximum value for the money spent consistent with company policies. You should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, falsification, misrepresentation of material facts or any other practice involving intentional unfair dealing.

59. Under a section titled, "Intentional Dishonesty," the Code of Ethics states the following, in relevant part:

Striving for excellence means operating our business with  high integrity, and avoiding deceptive, dishonest or fraudulent activities. Fraudulent actions are not only unethical, but may  also be a violation of law. You

should manage your particular  area of business with as much transparency as possible.

Acts of fraud or dishonesty are more likely to occur in environments with insufficient controls and unrealistic expectations. You should encourage a work environment that supports the contributions of your fellow team members, and  is based on our company's values and ethics.

60.    In a section titled "Financial Integrity," the Code of Ethics states the following:

Accurate and complete recordkeeping and reporting of financial information is essential to the successful operation of our company and our ability to meet our legal and regulatory obligations. Additionally, management requires honest, accurate and transparent reporting to make responsible business decisions. All financial books, records and accounts must accurately and completely reflect financial transactions and events. They must conform to generally accepted accounting principles and to our company's system of internal controls.

All team members must comply with company policies, procedures and controls designed to promote accurate and complete recordkeeping. Regardless of your level of responsibility within the company, you have a responsibility to be accurate, complete and honest in what you report and record, which could include accounting records, time cards, expense reports, invoices, payroll records, safety records, business records, performance evaluations, etc. No company document or record may be falsified for any reason, and no undisclosed or unrecorded accounts of company funds or assets may be established for any purpose.

All team members are expected to cooperate fully with Sprouts' internal and external auditors. You must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently  influence any auditor engaged in the performance of an investigation, audit or review of our company's financial statements.

If you see or suspect financial misconduct, or have questions or concerns about the company's accounting, auditing, financial reporting or internal controls, you should notify your supervisor immediately and call the Ethics Helpline.

61.     In a section titled "Insider Trading Laws," the Code of Ethics states the following:

> As a Sprouts team member, you may have access to material, non-public information about Sprouts or a third-party business partner which, if disclosed, could impact the value of publicly traded securities. If so, you are subject to our Insider Trading Policy, which specifies, among other things, that you are prohibited by law from disclosing or trading our stock based on such "inside information."

> You cannot share it with the media, financial analysts, competitors or other third parties, including friends and family. Disclosure of such inside information may result in individual criminal and civil liability and disciplinary action by Sprouts. If you have questions about our Insider Trading Policy or whether information has been made public, you should contact the Legal department.

***Officer Code of Ethics***

62.     The Officer Code of Ethics states that the Company "is committed to the highest standards of ethical business conduct and complying with applicable laws, rules and regulations." The purpose of the Officer Code of Ethics is to be used "as a set of guidelines pursuant to which our principal executive officer and principal financial officer, principal accounting officer and controller ("Senior Financial Officers") and persons performing similar functions (collectively, the "Covered Executives") should perform their duties."

63.     In discussing officers' responsibilities pertaining to financial reports, the Officer Code of Ethics states:

> To promote full, fair, accurate, timely and understandable disclosure in the periodic reports that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company, it is the responsibility of each Covered Executive promptly to bring to the attention of the Company's Disclosure Committee any material

information of which he or she may become aware that affects the disclosures made by the Company in its Commission filings or other public communications, and to otherwise assist the Disclosure Committee in fulfilling its responsibilities.

64.    In discussing officers' responsibilities pertaining to internal controls, the Officer Code of Ethics states:

In addition, each Covered Executive shall promptly bring to the attention of the Disclosure Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other team members who have a significant role in the Company's financial reporting, disclosures or internal controls.

65.    In discussing compliance with laws, rules, and regulations, the Officer Code of Ethics states:

In carrying out their duties and responsibilities, Covered Executives should endeavor to comply, and to cause the Company to comply, with applicable governmental laws, rules and regulations. In addition, each Covered Executive shall promptly bring to the attention of the Compliance Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

66.    Regarding waivers, the Officer Code of Ethics states:

Any Waiver of this Code may only be made by the Board. The Company will appropriately disclose any substantive amendment to, and any waiver of, any provision of the Code that applies to the Covered Executives.

***Director Code of Ethics***

67.    The Director Code of Ethics states that the Company "is committed to the highest standards of ethical business conduct and complying with applicable laws, rules

24

and regulations." The purpose of the Director Code of Ethics is to be used "as a set of guidelines pursuant to which our directors should perform their duties."

68. In a section titled "Fair Dealing," the Director Code of Ethics states:

> In carrying out their duties and responsibilities (including, among others, the appointment of officers of the Company and other senior management personnel and the establishment of Company policies), directors should promote fair dealing by the Company and its team members and agents with customers, suppliers, competitors and team members.

69. In a section titled "Compliance with Laws," the Director Code of Ethics states:

> In carrying out their duties and responsibilities, directors should endeavor to comply with applicable governmental laws, rules and regulations and Company policies. Directors shall also endeavor to cause the Company to comply with applicable governmental laws, rules and regulations. In addition, each director shall promptly bring to the attention of the Chief Legal Officer or the Chairman of the Board, as appropriate, any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

70. In a section titled "Compliance," the Director Code of Ethics states:

> Directors are expected to adhere to the Code. Each director shall promptly report to the Board any information he or she may have concerning evidence of a material violation of the Code. Suspected violations will be investigated at the direction of the Board. The Board shall determine appropriate actions to be taken in the event of violations of the Code by any director. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code.

> Any waiver of this Code may only be made by the Board. To the extent required by the federal securities laws or the rules of the NASDAQ Global Select Market, the Company will appropriately disclose any substantive amendment to, and any waiver of, any provision of the Code.

71.    In violation of the Codes of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Codes of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics and law.

## SPROUTS' AUDIT COMMITTEE CHARTER

72.    The Audit Committee Charter states that the purpose of the Audit Committee is to:

> The general purpose of the Committee is to provide oversight of the Company's accounting and financial reporting processes and audits of the financial statements of the Company and compliance with applicable legal requirements and regulations.
>
> The Committee is also responsible for preparing an audit committee report as required by the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

73.    Regarding the Audit Committee's responsibilities, in general, the Audit Committee Charter states:

> The Committee shall be responsible for carrying out the activities set forth below. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee outlined in this Charter.

While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee (i) to plan or conduct audits, (ii) to determine that the Company's financial statements are complete and accurate and are in accordance with accounting principles generally accepted in the United States of America or (iii) to design and implement internal controls and procedures to ensure the Company's compliance with applicable accounting standards, laws, and regulations. This is the responsibility of management and the independent auditor. The Committee's considerations and discussions with management and the independent auditors do not assure that the Company's financial statements are presented in accordance with GAAP, that the audit of the Company's financial statements has been carried out in accordance with applicable auditing standards, or that the Company's independent auditors are in fact "independent."

The business of the Company is managed under the direction of the Board and the various committees thereof, including the Committee. The basic responsibility of the Committee is to exercise its business judgment in carrying out the responsibilities described in this Charter in a manner the Committee members reasonably believe to be in the best interest of the Company and its stockholders. The Committee is not expected to assume an active role in the day-to-day operation or management of the Company.

74.    Regarding the Audit Committee's responsibilities pertaining to Financial Reporting, the Audit Committee Charter states:

- discussing and reviewing with management and internal and independent auditors any major issues regarding accounting principles and financial statements presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

- reviewing analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

- prior to release, reviewing and discussing with management and the independent auditor the Company's Annual Reports on Form 10-K,

Quarterly Reports on Form 10-Q, including the annual financial statements, the quarterly financial statements and the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in such reports, and recommending to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

- discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- discussing with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports concerning the Company's financial statements or accounting policies;

- meeting separately, periodically, with the Company's Chief Financial Officer, its Chief Legal Officer, and its Director of Internal Audit, and with representatives of the independent auditor;

- assessing the effect of regulatory and accounting initiatives on the Company's financial statements;

- reviewing the type and presentation of information to be included in earnings press releases, including any use of "pro forma" or "adjusted" non-GAAP information;

- discussing with the independent auditor any issues arising from the audit including:

  o any difficulties the auditor encountered;

  o any restrictions on the scope of the auditor's activities or access to information;

  o any significant disagreements with management concerning the audit or financial statements; management's response to these problems, difficulties or disagreements; and resolving any disagreements between the independent auditor and management;

  o any accounting adjustments that were noted or proposed by the auditor but were "passed"; and

28

○ any internal communication among the independent auditor regarding clarification of accounting practices or procedures.

75. Regarding the Audit Committee's responsibilities pertaining to "Internal Controls," the Audit Committee Charter states:

- reviewing the scope and performance of the internal audit, the responsibility and organization of the internal audit department, the adequacy of its resources and budget, the competence of its staff and whether it has the independence necessary to work in compliance with recognized standards of internal auditing;

- evaluating the Company's internal control systems and assessing their ability to ensure reliable, accurate records that are in compliance with applicable laws, regulations, and policies;

- reviewing potential conflicts of interest, including relationships with the Company and auditors; and

- investigating any cases of fraud, misconduct, or ethical breaches.

76. Regarding the Audit Committee's responsibilities pertaining to "Compliance," the Audit Committee Charter states:

- reviewing the effectiveness of the system for monitoring compliance with laws and regulations and the results of management's investigation and follow-up (including disciplinary action) of any instances of noncompliance;

- establishing procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

- reviewing and approving transactions with related persons in accordance with the Policy for the Review, Approval or Ratification of Transactions with Related Persons;

- producing an annual Committee report for inclusion in the Company's proxy statement (or Annual Report on Form 10-K) in accordance with

29

applicable rules and regulations of Nasdaq, the SEC, and other applicable regulatory bodies;

- reviewing the findings of any examinations by regulatory agencies, and any auditor observations;

- reviewing with management the Company's major financial risk exposures and steps management has taken to monitor and control such exposures;

- overseeing and reviewing the Company's environmental, social and governance (ESG) disclosures included in the Company's financial statements, and the adequacy and effectiveness of internal controls related to such disclosures;

- annually reviewing the adequacy of this Charter and submitting any recommended changes to the Board for its consideration;

- annually reviewing the performance of this Committee and providing the Board with any recommendations for changes in procedures and policies governing the Committee; and

- reporting to the Board regularly on its actions and deliberations

77. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the

Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

78.     Sprouts is a specialty grocery chain that focuses on health and wellness. Sprouts' products include fresh, natural, and organic groceries, in addition to plant-based, gluten-free, and other diet-specific options. The Company operates over 450 stores in 24 states.

79.     On April 30, 2025, during the Company's earnings call for the first quarter of the 2025 Fiscal Year, Defendant Valentine reported that the Company's guidance for the year would be "total sales growth to be 12% to 14% and comp sales in the range of 5.5% to 7.5%."

### False and Misleading Statements

***June 4, 2025 dbAccess Global Consumer Conference***

80.     On June 4, 2025, Defendants Sinclair and Valentine presented on behalf of the Company at the 2025 dbAccess Global Consumer Conference.

81.     During the presentation, Defendant Sinclair responded to a question regarding the Company's "volatile consumer confidence" by highlighting that the Company's customer base has remained resilient despite any macroeconomic impact, stating, in relevant part:

> *Krisztina Katai – Deutsche Bank AG*: Great. And I just wanted to ask a more near-term oriented question. It looks like Sprout doesn't experience or experiences very little just from the volatile consumer confidence and the

overall backdrop that we're experiencing in the U.S. Well, for example, yesterday, we heard about higher income household trade and accelerating from a dollar store? Could you speak to what you're seeing regarding your current consumer behavior? Have you seen any shifts over the last couple of weeks or even months as well?

*Defendant Sinclair*: Well, we're clearly watching this very closely because there's so much dialogue about consumer confidence and what's happening. And so you would have expected some things to have changed in our environment. The reality is we aren't seeing any change whatsoever, which is quite surprising even in the last few weeks.

Now whether that will stay, we're kind of second guessing whether it will stay like that. And we're very clear that by region, by category, trading up, trading down, we're not really seeing a significant change in the pattern of what's happening in our business. And you would probably have expected it by now, Krisztina to have seen something in that. ***I think our customer base is a little bit more resilient to what's going on in the macro environment, I think you've got customers who are very health focused***.

And if you're interested in your diet and you're a vegan, you've got to eat. You're probably going to stay eating the things that you're going to -- you're focused on in terms of our target customer. ***So I think that resilience comes and that gives us a lot of confidence going forward that irrespective of what happens in this pretty significantly uncertain time that we're going to be able to cope and deal with the changes as they come to us***.[2]

82.      In addition, Defendant Valentine stated that he feels "from a trade perspective, trade-in or trade down in that higher income consumer, I mean, one of those trades would be out of food away from home and into food at home, right, which actually creates maybe a little bit of a tailwind as that first wave of activity happens."

83.      In response to a follow up question, Defendant Sinclair responded the following, highlighting the Company's pricing and value propositions:

*Krisztina Katai – Deutsche Bank AG*: Right. So you have obviously

---

[2] Unless stated otherwise, all emphasis herein added.

32

embarked on the strategy shift, you've eliminated what you referred to as the coupon clippers that has resulted in a significant upgrade in household income. *So do you think that your model post the strategy change just makes you may be less vulnerable to the overall macro and overall price intensity of food retail*. Then I wanted to touch on, if you think about your pricing perception of Sprouts in particular, key departments across the store?

*Defendant Sinclair*: Well, very specifically, as -- we're not -- I'll talk about pricing specifically. Produce pricing is very important to us. We spend a lot of time, it's the origins of the company, it's the DNA of the company, it's a bigger proportion of our business than anything else. So we spend a lot of time looking at produce pricing. *We will have a very strong gap in organic product pricing, and we spend a lot of time analyzing where we need to be against conventional grocers and against Whole Foods as we look at our produce pricing*.

Other categories, we don't have the direct comparison. *Increasingly, we've been getting ourselves in a place where the assortment that we're carrying is not -- does not appear in other places with the possible exception of Whole Foods across the rest of the marketplace, we're not really carrying the same things as the other people*.

And the way we look at pricing is about elasticity if we put a product out there that's got a fair value for the customer, and no one else to sell and that the customer will buy it. If they don't buy it, then maybe we've got the pricing wrong. So there's a lot of micro pricing work being done in our organization to try and understand exactly where that needs to play out.

*And by and large, that the focus of our value proposition is we're giving customers healthy products, differentiated products, innovative products and they will respond to that*. And they've responded pretty well. And we don't see our price perception in the context of what is it against other grocers. We see it in the context of how does it work with our individual customers, and that's the context of our pricing decisions.

It's taken me a little while to get my mind around that as having been a grocer for 100 years in every other place. The context of thinking about this in a different way, reflects that we really love being different as a company and thinking that through is how we navigate our way to thinking about our price perception.

33

***July 30, 2025 Press Release***

84.    On July 30, 2025, the Company issued a press release (the "Q2 2025 Earnings Release") announcing its financial results for the second quarter of the 2025 Fiscal Year.

85.    The Q2 2025 Earnings Release revealed the following about the second quarter:

**Second Quarter Highlights**:

- **Net sales** totaled $2.2 billion; a 17% increase from the same period in 2024

- **Comparable store sales** growth of 10.2%

- **Diluted earnings per share** of $1.35; compared to diluted earnings per share of $0.94 in the same period in 2024

- **Opened 12 new stores**, resulting in **455 stores in 24 states** as of June 29, 2025

(Emphasis in original).

86.    Regarding guidance for the upcoming third quarter and full-year for the 2025 Fiscal Year, the Q2 2025 Earnings Release stated:

**Third Quarter and Full-Year 2025 Outlook**

The following provides information on our third quarter 2025 outlook:

- **Comparable store sales growth**: 6.0% to 8.0%

- **Diluted earnings per share**: $1.12 to $1

The following provides information on our full-year 2025 outlook:

- **Net sales growth**: 14.5% to 16.0%

- **Comparable store sales growth**: 7.5% to 9.0%

- **EBIT**: $675 million to $690 million

- **Diluted earnings per share**: $5.20 to $5.32

- **Unit growth**: At least 35 new stores

- Capital expenditures (net of landlord reimbursements): $230 million to $250 million

(Emphasis in original).

*July 30, 2025 Earnings Call*

87. That same day, the Company held an earnings call with investors and analysts to discuss the second quarter results (the "Q2 2025 Earnings Call").

88. During his scripted remarks on the Q2 2025 Earnings Call, Defendant Valentine elaborated on the Company's increase in guidance, stating, in relevant part:

*For 2025, we expect total sales growth to be 14.5% to 16% and comp sales in the range of 7.5% to 9%.* We still anticipate comp sales to moderate as we cycle the higher comps from late 2024. We plan to open at least 35 new stores. Earnings before interest and taxes are expected to be between $675 million and $690 million, and earnings per share are expected to be between $5.20 and $5.32, assuming no additional share repurchases. That said, we do expect to continue to repurchase shares opportunistically. We also expect our corporate tax rate to be approximately 24%. During the year, we expect capital expenditures net of landlord reimbursements to be between $230 million and $250 million. For the third quarter, we expect comp sales to be in the range of 6% to 8% and earnings per share to be between $1.12 and $1.16.

*As we have begun to lap last year's comp step changes, we continue to see consistent 2-year stack performance of approximately 15%.* In the second quarter, we also benefited from some external tailwinds that pushed the 2-year stack above our run rate in May and June. *While those tailwinds come and go, the approximately 15% 2-year stack remains consistent and gives us confidence in our increased comp guidance.*

35

89.     During his own scripted remarks, Defendant Sinclair highlighted how the Company's recent performance made him optimistic in the Company's ability to meet the updated guidance, stating, in relevant part:

*Currently, we are seeing strong customer acquisition and an increase in share of wallet*. Our customer experience is improving across all channels. In-store performance has strengthened due to better in-stocks, fresher products and superior service. Additionally, our e-commerce platform continues to grow with shop.sprouts.com experiencing the fastest increase in penetration.

\* \* \*

*As we look ahead, we remain confident in our strategic direction and Sprouts unique position within the specialty food retail landscape*. Our journey is not just about growing stores or improving margins, it's about deepening our connection with customers who seek real food, fresh quality ingredients and innovative products that meet their unique needs. We've been making progress, but we know there's much more to do, whether it's expanding our footprint, strengthening our supply chain or continuing to innovate. We're committed to building a resilient, purpose-driven company that delivers long-term value to our shareholders and positively impact the communities we serve.

90.     During the question-and-answer portion of the Q2 2025 Earnings Call, Defendant Valentine stated the following in response to a question regarding the rationale behind the Company's guidance:

*Edward Joseph Kelly – Wells Fargo Securities, LLC*: Nice quarter. I wanted to ask you about the comp and the cadence and momentum. So you talked about a stable sort of 15%-ish 2-year before May and June acceleration. So I was hoping you could speak to that acceleration. Curious if it was related to the disruption across the industry with UNFI. And then I'm curious what you've seen so far in July. And that kind of dovetails into guidance because the guidance for 6% to 8% in Q3, 6% is 15%, right? So you've guided the midpoint a little bit better than that. I'm just kind of curious about sustainability of current trend and how you were thinking about it all with guidance.

36

*Defendant Valentine*: Sure. Thanks, Edward. This is Curtis. Yes, *2 things really in May and June. Really, the biggest driver was we had a really strong produce season. So we've seen some really good organic crops and availability*. And so the team, again, has done a great job. We're well positioned. They work really closely with the growers. We're focused on local. They're focused on organic first. And so when we have a good season, particularly in organic, they're able to capitalize on it. And that's what we really saw through May and June. As the seasons evolve, that's kind of normalized a bit. But in May and June, we saw a nice pop in the produce business.

And then *the second piece, sure, there was quite a significant disruption in the natural organic space. And we had a limited impact there just because we have a smaller portion of our business there*. And so that was a helper, too. We had some people come our way when they couldn't find things elsewhere, and that also boosted them. That's a little bit more of the June. But the May, June story in total was a little bit better than that 15%.

*And then as far as how that's evolved quarter-to-date, both of those things have kind of settled and normalized a bit. And so we're kind of back into that 15% 2-year stack run rate. And really, quarter-to-date through July, it's right at the midpoint from a 2-year stack perspective*. And so that's what gives us the confidence in the guide. It's been -- *since we jumped up last September, 7 of the 11 periods have been in that 15% range with just a few periods where we've seen some external factors that we've capitalized and seen stronger numbers*. And so just the consistency of what we've seen, I think, gives us the confidence to guide where we guided.

91.     In response to a question about the fourth quarter expectations and whether they seem realistic, Defendant Valentine responded with the following:

*Scott Andrew Mushkin – R5 Capital LLC*: So my first one, and it's just about the fourth quarter. Thinking about, Curtis, what you said about kind of a 15% to 16%, I guess, stacked comp, that implies a pretty low comp for the fourth quarter. And I was just -- stacks are good until they're not good. And I was just wondering how you guys are thinking about the fourth quarter. I mean it seems like as the business is running right now, a 4% comp, even though it would get you stack in the same place, just doesn't seem realistic.

*Defendant Valentine*: Yes. I think, Scott, I think what we'll be watching, we've talked kind of for the year, the 3 big things, right, *as we comp the*

37

*comp, 2 big step changes last year, and we've cycled through the first one in May. The next big one is in September. And so we'll get a read on kind of your question*, could it be a little better in the fourth quarter from a 2- year stack perspective. We'll have that answer when we get through September here later this quarter.

The second piece was the new stores and particularly the comp impact from the [ 24 ] vintage. I think about 1/4 of the [ 24 ] vintage stores are now in the comp base. So that's still largely ahead of us. And then loyalty, loyalty will be some upside. If it takes off a little bit quicker than we think or has a bigger impact early than we think it might. That's a piece that we've been watching as well, but is largely in front of us. *And so I think we still have some questions to answer there. And certainly, we're going to go try to drive it higher and hope that it will be better. But for now, I think it's prudent to kind of stick to the 15% that we've been seeing pretty consistently for several months now*.

92.    In response to a question regarding the impact of macroeconomic issues, specifically inflation and on the subsequent impact on the Company's consumer base, Defendants Valentine and Sinclair responded:

*Rupesh Dhinoj Parikh – Oppenheimer & Co., Inc.*: I'll just kick it off with 2 macro questions. So just on inflation, just curious what you guys are seeing in the business and expectations going forward. And then on the consumer front, your business continues to perform quite well. Just curious if you're seeing any changes in dynamics around the consumer.

*Defendant Valentine*: On the inflation front, it's been pretty consistent from quarter-to-quarter. So we're seeing a similar -- we're tracking CPI in line with the way we typically do. Obviously, our fresh business is a little more volatile, but, it's tracking in line with that. And then we've got some kind of mix helpers as we move to organic and we work some of the value pack type things. So similar story to Q1 on the inflation and AUR front.

*Defendant Sinclair*: And in terms of the customer side of things, what we're seeing, *our customer seems to be being pretty resilient*. There's still a lot of uncertainty going forward that we're not quite sure about. But if we look at the numbers and we look at how our customers are *reacting, I think we've always said that our customer base is pretty focused on what they eat and how they eat and how they -- so I think we've got some resilience almost irrespective of what happens in the macro economy*. I think there's some

38

uncertainty going forward. We're not seeing a lot of dynamics in the other grocery retailers in terms of changing things too much. And *our business has proven pretty resilient, as you can see from the numbers*.

93. In response to a question regarding potential tailwinds from food away from home, Defendant Sinclair stated:

*Mark David Carden – UBS Investment Bank*: . . . we've seen restaurant traffic continue to decline over the past 3 months, a bit more moderate pace versus earlier in the year. *I know in the past, you guys have talked about some potential trade-in from food away from home. Do you believe you're seeing any more of a tailwind there*? And are you seeing any lifts in your prepared food sales?

*Defendant Sinclair*: We're working very hard in prepared foods. We've got a new salad program out there, a new meals program out there. So we're working hard at it. And the team are putting some really -- the deli team are doing some really good work in that space. *I'm encouraged by that, and it might be helping us a little bit as you go through that going forward*. It's something that we'll continue to invest in.

94. The Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the statements in ¶¶ 80-93 improperly failed to disclose, *inter alia*, that: (1) the Company was not as resilient to macroeconomic pressures as represented; (2) the Company was vulnerable to customers reducing spending in order to be more cautious; (3) as a result, the Company's comparables it used to project its fiscal guidance were inaccurate; and (4) the Company overestimated its fiscal guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

95. The truth emerged on October 29, 2025, when the Company issued the Q3

39

2025 Earnings Release. The Q3 2025 Earnings Release reported comparable store sales growth below both the Company's previous guidance as well as market expectations. As a result, the Q3 2025 Earnings Release also reported a reduction in the Company's guidance, stating, in relevant part:

**Third Quarter Highlights**:

- **Net sales** totaled $2.2 billion; a 13% increase from the same period in 2024

- **Comparable store sales** growth of 5.9%

- **Diluted earnings per share** of $1.22; compared to diluted earnings per share of $0.91 in the same period in 2024

- **Opened 9 new stores**, resulting in **464 stores in 24 states** as of September 28, 2025

\* \* \*

**Fourth Quarter and Full-Year 2025 Outlook**

The following provides information on our fourth quarter 2025 outlook:

- **Comparable store sales growth**: 0.0% to 2.0%

- **Diluted earnings per share**: $0.86 to $0.90

The following provides information on our full-year 2025 outlook:

- **Net sales growth**: approximately 14%

- **Comparable store sales growth**: approximately 7.0%

- **EBIT**: $675 million to $680 million

- **Diluted earnings per share**: $5.24 to $5.28

- **Unit growth**: 37 new stores

- **Capital expenditures (net of landlord reimbursements)**: $230 million to $250 million

(Emphasis in original).

96. Later that day, the Company held an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2025 Earnings Call").

97. During his prepared remarks on the Q3 2025 Earnings Call, Defendant Sinclair stated the following regarding the Company's performance in the third quarter:

In the third quarter, we delivered strong earnings growth, up 34% year-on-year with a 5.9% comp and strong new store performance. Our results continue to be driven by our execution on the key pillars of our strategy. We saw an increase in customer traffic as we effectively engaged with our target customers, while our most differentiated and attribute-based products continued to drive sales as we continue to expand our store presence.

\* \* \*

While it was a solid third quarter, *it fell short of our top line expectations. As the quarter progressed, our comp sales moderated faster than expected as we came up against challenging year-on-year comparisons as well as signs of a softening consumer*.

98. During his own prepared remarks, Defendant Valentine stated the following:

In the third quarter, total sales were $2.2 billion, up $255 million or 13% compared to the same period last year. *This growth was driven by a 5.9% increase in comparable store sales and the strong results from new stores*. Traffic remained positive and accounted for approximately 40% of our third quarter comp.

\* \* \*

While our third quarter yielded solid results, *we expected more from our top line as we underestimated the impact of lapping strong numbers from last year in the context of a softening consumer backdrop*. We believe our

strategy always has us well-positioned to capitalize on the surging interest in health and wellness.

99.    Defendant Valentine also stated the following, announcing that the Company's full-year guidance, which had just been increased in July, would be reduced:

As we look ahead for the remainder of this year, *we are balancing the strength of our business strategy against the consumer uncertainty and challenging year-over-year comp compares. For the full year, we expect total sales growth to be approximately 14% and comp sales to be approximately 7%.* Given the strong execution of our real estate pipeline and fewer time line delays, we now plan to open 37 new stores in 2025.

Earnings before interest and taxes are expected to be between $675 million and $680 million, and earnings per share are expected to be between $5.24 and $5.28, assuming no additional share repurchases. That said, we expect to continue repurchasing shares opportunistically. We also expect our corporate tax rate to be approximately 24% -- during the year, we expect capital expenditures, net of landlord reimbursements, to be between $230 million and $250 million.

*For the fourth quarter, we expect comp sales to be in the range of 0% to 2% and earnings per share to be between $0.86 and $0.90.* In the fourth quarter, year-over-year margin rate in both gross margin and SG&A are normalizing. Despite pressure to our top line, we expect to be able to grow EBIT dollars in line with our sales growth to deliver stable year-over-year margins in the fourth quarter.

Despite facing challenging revenue comparisons, we remain confident that we have a resilient business capable of delivering solid earnings growth.

100.    During the question-and-answer portion of the Q3 2025 Earnings Call, Defendant Sinclar stated the following in response to a question about how competition may play into the Company's fourth quarter guidance:

*Michael David Montani – Evercore ISI Institutional Equities*: I just wanted to ask, we've had some questions about concerns around competition that might be potentially encroaching on your core consumer. I just wanted to see kind of how you would respond to that, if there was other cyclical temporal headwinds that we should be thinking about in the quarter and then how that

42

could play out in the fourth quarter? And also, do you see this as a function of competition? Or is it something else?

*Defendant Sinclair*: Well, I think what we talked about in the script there, Mike, was very much there's -- ***we're lapping some tough numbers from last year. And at the same time, there's a kind of consumer context that feels like things are getting a little bit more difficult for the consumer***. So putting that into context, we always look at what our competitors are also doing and what the competitors are playing in there. But our strategy is pretty clear. We've got 7,500 new innovative products launched. I don't think -- I haven't seen anyone else launching that kind of number of innovation and differentiation.

101. In response to a question regarding the drivers behind the Company's business that have slowed down, Defendant Valentine responded:

*Seth Ian Sigman – Barclays Bank PLC*: here's a concern in the market that there have been some unique drivers helping your business over the last 12 months. You've had great performance and the concern is that those drivers are going away. As you reflect on that and the current slowdown that you're seeing, is there anything you would call out that's proving more difficult to lap?

And then you talked about keeping your customers. You grew your customers quite a bit last year. I mean, how are you seeing that play out? Are we seeing perhaps a change in spending behavior, lower spend per customer?

*Defendant Valentine*: Hi Seth, this is Curtis. We've just seen some pockets and windows where we've had some outsized growth and gains. We've talked about those on the call. Certainly, last October was our strongest month that we've compared against. It was a 13-and-change comp. February, we had some help from a strike at a competitor that was upside. And then May and June, we had strong months with a good customer season from produce and some challenges in the industry from a supply and a cyber issue. We saw customers come our way in those moments. We're always well positioned to kind of capitalize in those moments.

But we don't see anything structural in -- outside of those types of things that we're up against. But we do have those moments that we'll be up against over the course of the next 10 months. And then just, yes, a little bit of softness in our business. I mean we see things in more of our middle-income trade areas, some of our younger trade areas where we see those demographics, we've

seen the business soften just a little bit more than the rest of the business. And those are the things that we're kind of pointing to as it relates to the customer pressure.

102.    In response to a question regarding surprises in geographic regions and product categories, Defendants Sinclair and Valentine stated:

*Leah Dianne Jordan – Goldman Sachs Group, Inc.*: I'll kind of stick with the same theme around the comp slowdown. Just seeing if you could provide some more detail on the key surprises versus your expectations because this was a notable miss, right, below even your guide. Has there been any major difference across the regions or product categories?

And I think ultimately, you've historically talked about your offering being resilient to macro pressures as people are committed to their diets. But now you're talking about a softer consumer. So I think ultimately, has something shifted around your value proposition today? How do you view it? And I guess, why don't you see the need to invest a bit more to reengage your core consumer as you're really implying market share losses in the fourth quarter?

*Defendant Sinclair*: Well, I think the first thing we'd say is we're lapping some tough numbers from last year, and *we may have underestimated the challenge of lapping those numbers*. And it happened through the quarter as opposed to in the quarter. *And as we look forward, we're anticipating a challenging environment. We know what we've got to lap going forward, and we're anticipating a little bit of pressure on the consumer going forward*.

The health and wellness macro trends are still strong for us, and we see a real opportunity in doubling down on the loyalty program behind that going forward. And there are some macro pressures that I think you'll see coming through in the marketplace that we are certainly experiencing.

With regard to thinking about what should we do with -- we're not seeing a competitive dynamic changing dramatically in the marketplace in terms of pricing or activity. We've always promoted and we're very comfortable with promoting going forward. And we'll do what we need to do, but we're very strong in terms of managing our margins, managing our costs, and we'll consistently do that. You can see that from the numbers that we've just produced and the numbers that we will produce going forward. So no, we're not seeing anything dramatic in terms of the competitive dynamic in this space. We are seeing consumers under a bit of pressure, and we'll have to

react to that in some ways, and we are reacting to that in the appropriate way.

*Defendant Valentine*: And then to the miss in Q3, Leah, yes, **I think we sailed through that first step change in the comp in May and June and didn't really see the underlying pressure again**, probably masked a little bit of what was starting to go on there. But it was really the end of Q3, as Jack mentioned, where it really started to drop off a bit, and that's when we get up against the 10-plus comps here in September and then 13-plus in October. And so being a little bit cautious with where we are and looking ahead as we go up against the 10.5% and 10.5% roughly in November and December.

103.    On this news, the Company's share price dropped $27.30, approximately 26.1%, from a closing price of $104.55 per share on October 29, 2025 to close at a price of $77.25 per share on October 30, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

104.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of **over $59 million** to repurchase approximately 421,290 shares of its own common stock at artificially inflated prices between June 2025 and August 2025.

105.    According to the Form 10-Q filed by the Company on July 30, 2025, between May 26, 2025 and June 29, 2025, the Company repurchased 56,438 shares of its own common stock at an average price per share of approximately $165.09, for a total cost to the Company of approximately $9,317,349.[3]

106.    As the Company's stock was actually worth only $77.25 per share, the price

---

[3] Upon information and belief, such repurchases were made during the Relevant Period.

45

at closing on October 30, 2025, the Company overpaid by approximately $4,957,514 for repurchases of its own stock between May 26, 2025 and June 29, 2025.

107.    According to the Form 10-Q filed by the Company on October 29, 2025 (the "Q3 2025 10-Q"), between June 30, 2025 and July 27, 2025, the Company repurchased 52,781 shares of its own common stock at an average price per share of approximately $162.85, for a total cost to the Company of approximately $8,595,386.

108.    As the Company's stock was actually worth only $77.25 per share, the price at closing on October 30, 2025, the Company overpaid by approximately $4,518,054 for repurchases of its own stock between June 30, 2025 and July 27, 2025.

109.    According to the Q3 2025 10-Q, between July 28, 2025 and August 24, 2025, the Company repurchased 75,317 shares of its own common stock at an average price per share of approximately $150.19, for a total cost to the Company of $11,311,860.

110.    As the Company's stock was actually worth only $77.25 per share, the price at closing on October 30, 2025, the Company overpaid by approximately $5,493,622 for repurchases of its own stock between July 28, 2025 and August 24, 2025.

111.    According to the Q3 2025 10-Q, between August 25, 2025 and September 28, 2025, the Company repurchased 236,754 shares of its own common stock at an average price per share of approximately $125.85, for a total cost to the Company of $29,795,491.

112.    As the Company's stock was actually worth only $77.25 per share, the price at closing on October 30, 2025, the Company overpaid by approximately $11,506,244 for repurchases of its own stock between August 25, 2025 and September 28, 2025.

46

113. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *$26,475,434*.

**DAMAGES TO SPROUTS**

114. As a direct and proximate result of the Individual Defendants' conduct, Sprouts has lost and will continue to lose and expend many millions of dollars.

115. Such losses include approximately $26.5 million that the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

116. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

117. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

119. Additionally, these expenditures include, but are not limited to, unjust

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

120.    As a direct and proximate result of the Individual Defendants' conduct, Sprouts has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

121.    Plaintiff brings this action derivatively and for the benefit of Sprouts to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sprouts, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

122.    Sprouts is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff is, and has been at all relevant times, a shareholder of Sprouts. Plaintiff will adequately and fairly represent the interests of Sprouts in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

124.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

125.    A pre-suit demand on the Board is futile and, therefore, excused. At the

time of filing of this complaint, the Board consists of the following eight individuals: Defendants Sinclair, Anderson, Avula, Blum, Fortunato, Graham, O'Leary, and Rauch (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time of the filing of this complaint.

126.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact.

127.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by *approximately $26.5 million* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

49

128. Additional reasons that demand on Defendant Sinclair is futile follow. Defendant Sinclair has served as CEO and a Company director since June 2019. The Company provides Defendant Sinclair with his primary occupation, for which he receives a handsome salary. Thus, as the Company admits, he is a non-independent director. As a trusted Company director and the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Moreover, Defendant Sinclair is named as a defendant in the Securities Class Action. Further, Defendant Sinclair's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme. For these reasons, Defendant Sinclair breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129. Additional reasons that demand on Defendant Anderson is futile follow. Defendant Anderson has served as a Company director since 2019. He also serves as the Chair of the Talent and Compensation Committee and as a member of the Audit Committee. Defendant Anderson receives handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the

scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on Defendant Avula is futile follow. Defendant Avula has served as a Company director since 2022. He also serves as the Chair of the Audit Committee and as a member of the Risk Committee. Defendant Avula receives handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Avula breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on Defendant Blum is futile follow. Defendant Blum has served as a Company director since 2016. She also serves as the Chair of the Risk Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Blum receives handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Blum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132. Additional reasons that demand on Defendant Fortunato is futile follow. Defendant Fortunato has served as a Company director since 2013 and as Board Chairman since 2017. Defendant Fortunato receives handsome compensation for his role as a director. As the trusted Chair of the Company's Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant Fortunato's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme. For these reasons, Defendant Fortunato breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133. Additional reasons that demand on Defendant Graham is futile follow. Defendant Grant has served as Company director since 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Talent and Compensation Committee and the Risk Committee. Defendant Graham receives handsome compensation for her role as a director. As a trusted Company director, she

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Graham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134. Additional reasons that demand on Defendant O'Leary is futile follow. Defendant O'Leary has served as a Company director since 2017. He also serves as a member of the Talent and Compensation Committee and the Nominating and Corporate Governance Committee. Defendant O'Leary receives handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant O'Leary's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates his motive to participate in the scheme. For these reasons, Defendant O'Leary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Rauch is futile follow. Defendant Rauch has served as a Company director since 2020. He also serves as a member of the Audit Committee. Defendant Rauch receives handsome compensation for

his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Rauch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additional reasons that demand on the Board is futile follow.

137. Defendants Avula (as Chair), Anderson, Blum, and Rauch (the "Audit Committee Directors") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period and in violation of the Audit Committee Charter, the Audit Committee Directors engaged in or permitted the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Codes of Ethics. Thus, the Audit Committee Directors further breached their fiduciary duties, are not disinterested, and

demand is excused as to them.

138.    In violation of the Codes of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Codes of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Codes of Ethics. Thus, the Director-Defendants breached the Company's own Codes of Ethics, are not disinterested, and demand is excused as to them.

139.    Sprouts has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Sprouts any part of the damages Sprouts suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

140.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the

55

Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

141.    The acts complained of herein constitute violations of fiduciary duties owed by Sprouts' officers and directors, and these acts are incapable of ratification.

142.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sprouts. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sprouts, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

143.    If there is no directors' and officers' liability insurance, then the Director-

Defendants will not cause Sprouts to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

144. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

145. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Sprouts. Not only is Sprouts now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Sprouts by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially inflated prices, damaging Sprouts.

147. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct

designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

148.    The Individual Defendants employed devices, scheme, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sprouts not misleading.

149.    The Individual Defendants, as top executives, acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

150.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

58

152. The Individual Defendants, by virtue of their positions with Sprouts and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sprouts and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Sprouts to engage in the illegal conduct and practices complained of herein.

153. Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

154. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sprouts' business and affairs.

156. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

157. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sprouts.

158. In breach of their fiduciary duties owed to Sprouts, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, inter alia, that: (1) the Company was not as resilient to macroeconomic pressures as represented; (2) the Company was vulnerable to customers reducing spending in order to be more cautious; (3) as a result, the Company's comparables it used to project its fiscal guidance were inaccurate; and (4) the Company overestimated its fiscal guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

159.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

160.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants allowed the Company to repurchase thousands of shares of its own stock at artificially inflated prices, while three of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $8.6 million.

161.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sprouts' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to

prevent it from continuing to occur.

162. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sprouts has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164. Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

165. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sprouts.

167. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sprouts that was tied to the performance or artificially inflated valuation of Sprouts, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the

61

Company.

168. Plaintiff, as a shareholder and a representative of Sprouts, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

169. Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

170. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sprouts, for which they are legally responsible.

172. As a direct and proximate result of the Individual Defendants' abuse of control, Sprouts has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Sprouts has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173. Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

174. Plaintiff incorporates by reference and re-alleges each and every allegation

set forth above, as though fully set forth herein.

175. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sprouts in a manner consistent with the operations of a publicly held corporation.

176. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sprouts has sustained and will continue to sustain significant damages.

177. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

178. Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

### SEVENTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

179. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

181. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

182. As a result of the foregoing, and by failing to properly consider the interests

of the Company and its public shareholders, the Individual Defendants have caused Sprouts to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

183.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff, on behalf of Sprouts, has no adequate remedy at law.

## EIGHTH CLAIM
**Against Defendants Sinclair and Valentine for Contribution Under Sections 10(b) and 21D of the Exchange Act**

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    Sprouts and Defendants Sinclair and Valentine are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sinclair's and Valentine's willful and/or reckless violations of their obligations as officers and/or directors of Sprouts.

187.    Defendants Sinclair and Valentine, because of their positions of control and authority as officers and/or directors of Sprouts, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sprouts, including

the wrongful acts complained of herein and in the Securities Class Action.

188.   Accordingly, Defendants Sinclair and Valentine are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

189.   As such, Sprouts is entitled to receive all appropriate contribution or indemnification from Defendants Sinclair and Valentine.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Sprouts, and that Plaintiff is an adequate representative of the Company;

(b)   Determining and awarding to Sprouts the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(c)   Directing Sprouts and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sprouts and its shareholders from a repeat of the damaging events described herein. The following actions may be necessary to ensure proper corporate governance policies:

1.   a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into

the policies and guidelines of the board;

2. a provision to permit the shareholders of Sprouts to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Sprouts restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2025        **MCKAY LAW, LLC**

By:*/s/ Michael McKay*
Michael McKay (023354)
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, New York 11771
Telephone: (516) 922-5427

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Fraser MacDonald, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of December, 2025.

Signed by:

ACADC14C703B4A4...

Fraser MacDonald